| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| THOMASBORO LANDCO, LLC, | ) | |
| | ) | Case No. 22-10260-HAC-11 |
| Debtor. | ) | |
| ———————————————— | ) | |
| LEGALIST, INC., on behalf of itself and | ) | |
| certain investment fund(s) for which it | ) | |
| serves as investment advisor, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Proc. No. 24-01038 |
| v. | ) | |
| | ) | |
| THOMASBORO LANDCO, LLC, | ) | |
| CRITERIA DEVLOPMENT, LLC, | ) | |
| and J. MARION UTER, | ) | SECOND AMENDED |
| | ) | ADVERSARY COMPLAINT |
| Defendants. | ) | |
| ———————————————— | ) | |

# TABLE OF CONTENTS

Nature of Action………………………………………………………...………………....…1

Jurisdiction and Venue……………………………………………………………...……4

Parties………………………………………………………………………………...……4

Background………………………………………………………………………….....…5

A.  General Debtor and Bankruptcy Case Background……...….......................................5

B.  Bankruptcy Court Approves DIP Facility and Terms of DIP Credit Agreement….…….…6

C.  DIP Lender Advances $26 Million Under DIP Facility Based On Representations Of Full Compliance With DIP Credit Agreement, DIP Financing Order and Budget………………………………………………8

D.  The Debtor's Plan is Confirmed…………………………………………….……...10

E.  Debtor Commits Numerous Defaults Under DIP Credit Agreement By Granting Competing Liens in Thomasboro Property And Conveying Almost 90% of Thomasboro Property To Non-Debtor, All Without Notice or Advance Consent From DIP Lender Consent……………………………………….......11

F.  Troubling Details of Fraudulent Conspiracy That Precipitated ED Transfer and Thomasboro II Transfer…………………………………………………13

    a.  Details Surrounding East Development Lien……………...……………….13

    b.  Details Surrounding Thomasboro Landco II LLC ………...………………….15

G.  Uter, on behalf of Debtor And Thomasboro II, Executes First Forbearance Agreement To Avoid DIP Lender's First Motion to Compel….……..…….17

H.  Uter Executes Deed of Trust On Behalf Of Thomasboro II Without Authority To Do So, Then Causes Deed To Be Delivered To DIP Lender And Recorded……...……………………………………………..……..20

I.  Debtor Defaults Under First Forbearance Agreement, Prompting DIP Lender to Commence This Adversary Proceeding……………………………...……21

J.  Thomasboro II Aligns With East Development And Denies that Uter Had Authority to Execute DIP Lender DOT On Its Behalf ………………………………......22

K.  Uter And Debtor Refuse To Refute Thomasboro II Denials Or Respond To DIP Lender Requests, Resulting In Delay And Increased Costs For DIP Lender………………………………………………………..……..23

L.    Uter, Debtor And Criteria Development Fail To Advance Prospects Of Obtaining Funds To Repay DIP Facility……………………………………..…24

M.    DIP Lender Files First Amended Complaint………………………………..……….25

N.    Mediation Results In Settlement Agreement and Second Forbearance Agreement………………………………………………………………..………...26

O.    Defendants Once Again Fail To Fulfill Their Promise To Repay DIP Facility………...27

Count I Fraudulent Concealment – ED Transfer……………………………………...28

Count II Fraudulent Misrepresentation – ED Transfer…………………………………..31

Count III Fraudulent Concealment – Thomasboro II Transfer………………………….…32

Count IV Fraudulent Misrepresentation – Thomasboro II Transfer……………………..…36

Count V Breach of Contract – First Forbearance Agreement…………………………..…..…37

Count VI Fraudulent Inducement – First Forbearance Agreement………………..…………38

Count VII Negligent Misrepresentation – First Forbearance Agreement………………………39

Count VIII Violation of the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. Ann. § 75-16)…………………………………………40

PLAINTIFF LEGALIST, INC., on behalf of itself and certain investment fund(s) for which it serves as investment advisor (collectively, "**Legalist**" or "**DIP Lender**"), by and through its undersigned attorneys, hereby submits this second amended adversary complaint (the "**Second Amended Complaint**")

## NATURE OF ACTION

1.     Notwithstanding the settlement DIP Lender reached with former defendants in this action following its filing of the original and first amended complaints that have cleared the way for DIP Lender to finally foreclose on the Thomasboro Property (as defined below), DIP Lender has still been injured to the tune of millions of dollars by the actions of the remaining defendants.

2.     The Second Amended Complaint seeks to redress those injuries through the continued prosecution of some (but not all) causes of action asserted in the prior complaint (Adv. No. 61, the "**First Amended Complaint**"), as modified herein.

3.     In summary, those causes of action seek entry of a damages judgment in favor of DIP Lender to redress the harm caused by certain fraudulent actions and misrepresentations undertaken by DEFENDANT J. MARION UTER ("**Uter**") in his individual capacity and as manager and agent for DEFENDANT THOMASBORO LANDCO, LLC (*i.e.*, the above-captioned "**Debtor**") and DEFENDANT CRITERIA DEVLOPMENT, LLC ("**Criteria Development**" and, together with Uter and Debtor, the "**Defendants**") with the intent, and having the effect, of hindering, delaying and increasing the costs of DIP Lender's ability to enforce rights and liens that DIP Lender was granted by orders of the Bankruptcy Court under

1

federal bankruptcy law with respect to substantially all assets of the Debtor as of May 16, 2022 (including the Thomasboro Property) and all proceeds thereof.

4.    First, Uter caused Debtor – in exchange for no consideration to Debtor or its bankruptcy estate – to grant a deed of trust (as described more fully below, the "**ED Transfer**") using the entirety of the Thomasboro Property to secure repayment of not less than $5 million borrowed by Criteria Development, guarantied by Uter, and used to fund expenses unrelated to construction of the Thomasboro Property.

5.    Second, Uter caused Debtor – in exchange for no consideration to Debtor or its bankruptcy estate – to convey by warranty deed almost 90% of the total acreage of the Thomasboro Property (as described more fully below, the "**Thomasboro II Transfer**") to a newly incorporated non-debtor entity called Thomasboro Landco II LLC ("**Thomasboro II**").

6.    Both the ED Transfer and Thomasboro II Transfer were undertaken in secret and without notice to DIP Lender, who continued to lend Debtor millions of dollars after such transactions took place in reliance on multiple express representations by Uter that Debtor was in full compliance with the terms of the DIP Credit Agreement (as defined below).

7.    Third, Uter – in his alleged capacity as "manager" of Thomasboro II – agreed to and did execute and cause to be recorded a false deed of trust purporting to convey to DIP Lender on behalf of Thomasboro II a lien and security interest in the portion of the Thomasboro Property previously conveyed to Thomasboro II by the Thomasboro II Transfer (the "**False DIP Lender DOT**").

8.    Uter's execution and recording of the False DIP Lender DOT followed numerous express and oral representations to DIP Lender by Uter and counsel for the Defendants that

2

Thomasboro II was under the same ownership and control as Debtor, and that Uter was manager of and held authority to sign for Thomasboro II.

9.      In fact, as Uter at all relevant times knew – and as all entities Uter managed, including Debtor and Criteria Development, knew as well by imputation – Thomasboro II was never under the same ownership and control as the Debtor, and Uter was never the manager of Thomasboro II nor had any authority to sign deeds of trust on its behalf.

10.     Defendants made these misrepresentations to convince DIP Lender to accept the False DIP Lender DOT in exchange for DIP Lender's agreement (a) to drop its then-pending motion before the Bankruptcy Court for an order compelling Debtor's compliance with prior orders of the Bankruptcy Court and (b) to forbear from exercising further rights and remedies for seven weeks, by which time the Debtor promised to repay DIP Lender in full.

11.     As a result of Defendants' ruse, DIP Lender lost months of valuable time and opportunity costs, and incurred (and continue to incur) substantial attorney's fees and costs litigating to achieve outcomes the Defendants promised under false pretenses to provide more than nine months ago.

12.     In sum, the misrepresentations and omissions that made all of these actions possible – the ED Transfer, the Thomasboro II Transfer and the False DIP Lender Deed – were made by Defendants in knowing disregard of the false premises they involved, of the breaches they caused with Debtor's contractual acknowledgements and obligations to DIP Lender, and of the roadblocks they placed to fulfillment of prior orders of the Bankruptcy Court.

13.     Defendants made these misrepresentations and omissions – on which DIP Lender reasonably relied to its detriment – with the intent of misleading DIP Lender and inducing its reliance on a false reality under which DIP Lender remained unaware of – and therefore

continued to lend and/or forbear despite – the negative impact those actions would have on its ability to look to the Thomasboro Property for credit support when Debtor failed to repay its loan.

14.     Accordingly, by this Second Amended Complaint, DIP Lender seeks a judgment for the damages caused by the Defendants' fraud, conspiracy and false lien filing (including treble damages available under applicable law).

<u>**JURISDICTION AND VENUE**</u>

15.     This adversary proceeding arises in and/or is related to *In re Thomasboro Landco, LLC*, Chapter 11 Case No. 22-10260-HAC (the above-captioned "**Bankruptcy Case**") pending in this district before the United States Bankruptcy Court for the Southern District of Alabama (the "**Bankruptcy Court**").

16.     The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

17.     Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

18.     This is a core proceeding under 28 U.S.C. § 157(b).

19.     Plaintiff consents to entry of a final order or judgment by the Bankruptcy Court in this matter.

<u>**PARTIES**</u>

20.     PLAINTIFF LEGALIST (aka "**DIP Lender**") is a Delaware corporation.

21.     DEFENDANT THOMASBORO LANDCO, LLC (aka the "**Debtor**" in the above-captioned Bankruptcy Case) is a North Carolina limited liability company with its principal place of business and its chief executive office located in the Southern District of Alabama.

4

22.     DEFENDANT CRITERIA DEVELOPMENT, LLC ("**Criteria Development**"), is an Alabama limited liability company.

23.     DEFENDANT J. MARION UTER ("**Uter**") is an individual residing in, on information and belief, the State of Florida.

24.     Since the commencement of the underlying Bankruptcy Case here on February 11, 2022, Uter has been the authorized signatory on petitions commencing Chapter 11 cases in this Bankruptcy Court for at least four other entities that he purports to own or control, all of which were subsequently dismissed prior to confirmation of any plan. *See In re Galvin's Ridge Landco, LLC*, Case No. 22-10258-HAC (Bankr. S.D. Ala. filed Feb. 11, 2022, dismissed July 21, 2022); *In re Criteria Equipment Co., LLC*, Case No. 22-10326-HAC (Bankr. S.D. Ala. filed Feb. 22, 2022, dismissed Mar. 21, 2023); *In re Reeves Farm Landco, LLC*, Case No. 23-10844-JCO (Bankr. S.D. Ala. filed Apr. 14, 2023, dismissed Sept. 12, 2023); *In re Grandeur Trinity, LLC*, Case No. 24-10587-JCO (Bankr. S.D. Ala. filed Mar. 7, 2024, dismissed May 1, 2024).

**BACKGROUND**

**A.     General Debtor and Bankruptcy Case Background**

25.     On February 11, 2022 (the "**Petition Date**"), the Debtor filed with the Bankruptcy Court a voluntary Chapter 11 petition commencing the Bankruptcy Case.

26.     At all relevant times, the Debtor's membership interests have been and continue to be owned 50% by Defendant J. Marion Uter, and 50% by E. Stephen Stroud. *See* Bankruptcy Case Doc. No. 14.

27.     At all relevant times, Defendant J. Marion Uter, has been and continues to be the manager of Debtor. *See* Bankruptcy Case Doc. No. 14.

5

28.     The Debtor's principal asset is 1,137.4 acres of land located in Brunswick County, North Carolina (aka the "**Thomasboro Property**") comprising approximately 2,500 entitled residential lots (the "**Entitled Lots**").

## B.     Bankruptcy Court Approves DIP Facility and Terms of DIP Credit Agreement

29.     On April 8, 2022, the Debtor filed the DIP Financing Motion[1] by which Debtor sought Bankruptcy Court authority to borrow from DIP Lender approximately $26 million in new money under a 24-month multi-draw debtor-in-possession financing facility (the "**DIP Facility**").

30.     The DIP Facility is governed by the terms and conditions of the DIP Credit Agreement,[2] pursuant to which the Debtor agreed, subject to Bankruptcy Court approval, to grant DIP Lender security interests and liens (as defined therein, the "**DIP Liens**") on substantially all Debtor assets (as defined therein, the "**DIP Collateral**"), to secure Debtor's payment and performance of all obligations due and owing to DIP Lender thereunder (as defined therein, the "**DIP Obligations**").

31.     Describing the DIP Liens in the DIP Financing Motion, the Debtor clearly stated on the first page thereof "[t]he liens proposed to be granted would be senior liens <u>on all property of the Debtor</u>" and "be deemed perfected <u>without the need for any further filings</u>" (emphasis added).

---

[1] "**DIP Financing Motion**" refers to that certain *Debtor's Motion For Final Order Authorizing The Debtor To Obtain Postpetition Financing And Grant Senior Liens And Superpriority Administrative Expense* (Docket Number 51 in the Bankruptcy Case).

[2] "**DIP Credit Agreement**" refers to the final executed version of that certain *Debtor-In-Possession Term Loan Credit Agreement* dated as of May 25, 2022 entered into among Debtor and DIP Lender. The terms of the DIP Credit Agreement, a true and correct copy of which is attached hereto as <u>Exhibit A</u>, are hereby expressly incorporated into this Complaint as if fully set forth herein.

6

32.     On May 16, 2022, the Bankruptcy Court entered the DIP Financing Order,[3]

granting the DIP Financing Motion on a final basis.

33.     Among other things, the DIP Financing Order ordered, pursuant to 11 U.S.C.

§§ 364(c) and (d), that:

> The DIP Lender holds security interests in and liens on all
> DIP Collateral … which the Debtor has (to the extent of its right
> title, and interest therein) assigned and conveyed as security,
> hypothecated, mortgaged, pledged and set over and unto the
> DIP Lender, and which have been automatically perfected
> _notwithstanding any notice or recordance requirements of non-_
> _bankruptcy law_ (collectively, the "DIP Liens") ….

_See_ Ex. B, ¶ 9 (emphasis added).

34.     Similarly, the DIP Credit Agreement – executed by Uter on behalf of Debtor –

itself provides:

> The Debtor acknowledges that, pursuant to the DIP [Financing]
> Order, the DIP Liens granted to the DIP Lender in all DIP
> Collateral shall be automatically perfected without reference to any
> notice or recordation requirements of non-bankruptcy law.

_See_ Ex. A, § 10.02 (emphasis added).

35.     As a result, since May 16, 2022, DIP Lender has had and continues to have a

valid, perfected DIP Lien in the entirety of the Thomasboro Property, including all Entitled Lots

thereon, notwithstanding a deed of trust embodying the DIP Lien was not recorded with the

Register of Deeds in Brunswick County, North Carolina where the Thomasboro Property is

located until September 2024.

36.     Furthermore, as relevant here, the Debtor and DIP Lender agreed in the DIP

Credit Agreement that:

---

[3] "**DIP Financing Order**" refers to that certain _Final Order Authorizing Debtor-In-Possession Financing_
(Docket Number 97 in the Bankruptcy Case). The terms of the DIP Financing Order, a true and correct copy of
which is attached hereto as Exhibit B, are hereby expressly incorporated into this Complaint as if fully set forth
herein.

**Section 10.04  Further Assurances**.  The Debtor further agrees that, if requested by the DIP Lender, [Debtor] shall enter into any separate security agreement, control agreement, pledge agreement, or other similar documentation or instrument with respect to any DIP Collateral that the DIP Lender may request, all expenses of which incurred shall constitute DIP Lender Expenses.

[…]

**Section 11.07  Submission to Jurisdiction**.  Each party agrees that any action with respect to any DIP Loan Document shall be brought exclusively in the Bankruptcy Court and unconditionally submits to the Bankruptcy Court's jurisdiction regarding the same. Upon entry of an order of the Bankruptcy Court confirming the Debtor's plan, the Bankruptcy Court shall continue to have exclusive jurisdiction over the DIP Loan Documents until the closing of the Debtor's Case.

*See* Ex. A (emphasis added).

37.     In accordance with Section 11.07 of the DIP Credit Agreement, the Bankruptcy Court ordered in the DIP Financing Order that it "has and shall retain jurisdiction to enforce this [DIP Financing Order], including to hear any motion or application by … DIP Lender related hereto…."  *See* Ex. B, ⁋ 25.

38.     This Complaint, and the relief DIP Lender requests herein, falls within the scope of actions for which the Bankruptcy Court retained jurisdiction in the DIP Financing Order.

**C.     DIP Lender Advances $26 Million Under DIP Facility Based On Representations Of Full Compliance With DIP Credit Agreement, DIP Financing Order and Budget**

39.     On May 25, 2022, DIP Lender advanced $12,391,680.83 under the DIP Facility in the form of a direct payment to Debtor's prepetition secured lenders in full satisfaction of their claims and liens against the Thomasboro Property.  *See* Ex. B, ⁋ 6; Ex. A, § 2.02(i).

40.     Thereafter, in approximate intervals of once per month, Debtor submitted twelve separate requests to DIP Lender to borrower funds under the DIP Facility for development of the Thomasboro Property.  Each such request was made in writing using the form attached as

Exhibit A to the DIP Credit Agreement, signed by Uter on behalf of Debtor, and contained the following acknowledgement and agreement as of the date thereof:

> The Debtor hereby acknowledges that, pursuant to Section 3.01(iii) of the [DIP] Credit Agreement, each of the representations and warranties of the Debtor set forth in the Credit Agreement and in each other DIP Loan Document is true and correct as of the date hereof […]. The Debtor agrees that if, at any time prior to the time the DIP Draw is funded by the DIP Lender, any matter certified to herein by it will not be true and correct in all material respects at such time as if then made, it will immediately so notify the DIP Lender.[4]

41. As relevant here, the referenced representations in the DIP Credit Agreement that Uter, on behalf of Debtor, confirmed to be true and correct as of the date of each borrowing request include:

> **Section 4.03  DIP Collateral**.  The Debtor has good and marketable title to all DIP Collateral, <u>free and clear of all Liens</u>, security interests, pledges, and other encumbrances, other than the DIP Liens […].
>
> **Section 4.04  Absence of Material Adverse Change**.  There has been no act, condition, or event that has had, or may reasonably be expected to have, a material adverse effect on the Debtor or its operations since the Petition Date.
>
> **Section 4.06  Misstatements and Omissions**.  Since the Petition Date, no information furnished or made available by the Debtor (directly or indirectly) to the DIP Lender (including all information contained in the [Bankruptcy] Case's docket) (x) contains any material misstatement of fact or (y) omits any material fact necessary to make such information not misleading.

*See* Ex. A (emphasis added).

42. In reasonable reliance on these representations, between June 17, 2022, and June 5, 2023, DIP Lender advanced all funds requested by Debtor in each of its twelve draw requests, via wire transfer of such funds to an account at Regions Bank in the name of

---

[4] *See, e.g.*, DIP Facility Borrowing Request dated June 16, 2022, a true and correct copy of which is attached hereto as <u>Exhibit C</u>.

"Thomasboro Landco LLC, Chapter 11 Debtor-In-Possession" (Acct. No. XX4229).

43. By these twelve advances, DIP Lender lent to the Debtor, and Debtor borrower from DIP Lender subject to the DIP Credit Agreement and DIP Financing Order, $13,552,989.39 in the aggregate to fund development of the Thomasboro Property.[5]

44. Following the last advance made by DIP Lender on June 5, 2023, substantially all of the $26 million of new funding DIP Lender agreed to make available under the DIP Facility had been withdrawn, and the DIP Facility has remained fully extended and outstanding since then.

**D.    The Debtor's Plan is Confirmed**

45. On May 31, 2022, the Debtor filed its Chapter 11 Plan.[6]

46. The Plan provided (among other things) that (a) any and all amounts owed or to be owed by the Debtor to DIP Lender under the DIP Facility (all such amounts defined therein as the "**DIP Loan Claims**") constituted superpriority expense claims under 11 U.S.C. § 507(a)(1), (b) DIP Loan Claims were classified as a standalone unimpaired class (Class 3), (c) Debtor "shall pay the DIP Loan Claims in full in accordance with the DIP Loan Documents" the terms of which "shall remain in full force and effect," and (d) "DIP Lender shall retain all liens and security interests in the Collateral provided for under the DIP Loan Documents and DIP Financing Order." *See* Ex. D, §§ 3.03 and 5.05 (emphasis added).

47. On July 21, 2024, the Court entered the Confirmation Order[7] confirming the Plan.

---

[5] For the avoidance of doubt, DIP Lender makes no admissions herein regarding the Debtor's actual use of funds it advanced to the Debtor under the DIP Facility.  DIP Lender reserves all rights.

[6] "**Plan**" refers to that certain *First Amended Plan of Reorganization* (Docket Number 106 in the Bankruptcy Case).  The terms of the Plan, a true and correct copy of which is attached hereto as Exhibit D, are hereby expressly incorporated into this Complaint as if fully set forth herein.

[7] "**Confirmation Order**" refers to that certain *Order Confirming Plan* (Docket Number 137 in the Bankruptcy Case).  The terms of the Confirmation Order, a true and correct copy of which is attached hereto as Exhibit E, are hereby expressly incorporated into this Complaint as if fully set forth herein.

48. In the Confirmation Order, the Bankruptcy Court ordered that "[n]otwithstanding the entry of this Confirmation Order and the occurrence of the Effective Date, until this case is closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction of this case that is permitted under applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out." *See* Ex. E, ¶ 10.

49. Moreover, the Court explicitly retained jurisdiction for specific purposes set forth in Article 12 of the Plan, including:

- "to enforce all orders, judgments, injunctions, and rulings entered in connection with the Reorganization Case" (Ex. D, § 12.02(k));

- "to determine all questions and disputes" regarding "any sale or transfer of assets or Property by the Debtor or Reorganized Debtor" or "title to the assets of the Debtor, the Estate, or the Reorganized Debtor" (Ex. D, §§ 12.02(m) and (n) (emphasis added)); and

- "to determine any matters that may arise in connection with or relating to the DIP Loan, the DIP Loan Documents, or the DIP Financing Order" (Ex. D, § 12.02(t)).

50. This Complaint, and the relief DIP Lender requests herein, falls within the scope of actions for which the Bankruptcy Court retained jurisdiction in the Confirmation Order.

**E. Debtor Commits Numerous Defaults Under DIP Credit Agreement By Granting Granting Competing Liens in Thomasboro Property And Conveying Almost 90% of Thomasboro Property To Non-Debtor, All Without Notice or Advance Consent From DIP Lender Consent**

51. The DIP Credit Agreement prohibits Debtor from granting liens in the Thomasboro Property without first obtaining DIP Lender's advance consent to do so.

52. The purpose of this prohibition is to give DIP Lender the opportunity to prevent the Debtor from issuing such liens unless the grantees acknowledge the liens they are receiving are junior in priority to the DIP Lien and agree to certain typical restrictions on their ability to

11

oppose, limit, delay or prevent efforts or foreclosure proceedings by DIP Lender to satisfy outstanding DIP Obligations out of their shared collateral (*i.e.* the Thomasboro Property).

53.     After the DIP Lien in the Thomasboro Property had been granted to DIP Lender and automatically perfected pursuant to the DIP Financing Order, without obtaining DIP Lender's advance consent in compliance with the DIP Credit Agreement, and without any notice at all to DIP Lender in most if not all cases, Debtor issued deeds of trust to five separate beneficiaries, granting each of them a lien in all or a portion of the Thomasboro Property.

54.     These five deeds of trust were recorded with the Brunswick County Register of Deeds as follows:

      a.    Deed of Trust dated August 8, 2022, and filed of record with the Brunswick County Register of Deeds at Book: 4911 Page: 974 on September 15, 2022, granted by Debtor for the benefit of Caviness & Cates Building and Development Company of Greenville ("**Caviness & Cates**") on certain Entitled Lots within the Thomasboro Property (the "**C&C Lien**");

      b.    Deed of Trust dated January 10, 2023, and filed of record with the Brunswick County Register of Deeds at Book: 4959 Page: 1280 on January 10, 2023, granted by Debtor for the benefit of NVR, Inc. ("**NVR**") on certain Entitled Lots within the Thomasboro Property (the "**NVR Lien**");

      c.    Deed of Trust dated February 22, 2023, and filed of record with the Brunswick County Register of Deeds at Book: 4997 Page: 0062 on April 10, 2023, granted by Debtor for the benefit of East Development, LLC ("**East Development**") on the entirety of the Thomasboro Property[8] (the "**East Development Lien**");

      d.    Deed of Trust dated May 30, 2024, and filed of record with the Brunswick County Register of Deeds on May 30, 2024 at Book: 5184 Page: 1317, granted by Debtor for the benefit of Great Southern Homes, Inc. ("**Great Southern Homes**") on certain Entitled Lots within the Thomasboro Property (the "**GSH Lien**");

      e.    Deed of Trust dated July 25, 2024, and filed of record with the Brunswick County Register of Deeds at Book: 5219 Page: 887 on August 9, 2024,

---

[8] The "**East Development DOT**" a true and correct copy of which is attached hereto as <u>Exhibit F</u>. The terms of the East Development DOT are hereby expressly incorporated into this Complaint as if fully set forth herein.

granted by Debtor for the benefit of New Leaf Builders of NC, LLC ("**New Leaf**") on certain Entitled Lots within the Thomasboro Property (the "**NL Lien**" and, together with the C&C Lien, the NVR Lien, the East Development Lien and the GSH Lien, the "**Third-Party Liens**").

55.     In addition to granting these liens in violation of the DIP Credit Agreement, the Debtor also defaulted by:

   a.   secretly deeding ownership of almost 90% of the acreage of the Thomasboro Property to a newly created non-Debtor entity, Thomasboro II, by a Special Warranty Deed dated April 26, 2023, as recorded seven months later on November 27, 2023 with the Brunswick County, NC Register of Deeds at Book 5104, Pages 1087-1093[9] (the "**Thomasboro II Transfer**"), and

   b.   failing to make required payments on the DIP Facility as and when due, including upon its maturity at the end of August 2024.

## F.   Troubling Details of Fraudulent Conspiracy That Precipitated ED Transfer and Thomasboro II Transfer

56.     While each of the Debtor's transfers concerning the Thomasboro Property was an admitted violation of the DIP Credit Agreement (and, in turn, the DIP Financing Order), the ED Transfer and Thomasboro II Transfer were especially troubling to DIP Lender, prompting it to investigate those transfers further after first becoming aware of them in August 2024.

57.     The details DIP Lender has uncovered about these transactions to date have confirmed DIP Lender's suspicions that these two transactions were acts of fraud committed by Uter, acting for himself as well as through/on behalf of Criteria Development and Debtor.

### a.   Details Surrounding East Development Lien

58.     Whereas the four Third-Party Lien recipients other than East Development are all homebuilders who each received individualized and non-overlapping deeds of trust on certain

---

[9] The "**Thomasboro II Warranty Deed**" a true and correct copy of which is attached hereto as <u>Exhibit G</u>. The terms of the Thomasboro II Warranty Deed are hereby expressly incorporated into this Complaint as if fully set forth herein.

Entitled Lots within the Thomasboro Property, the same cannot be said regarding East Development and the circumstances underlying the ED Transfer.

59.     East Development is not a homebuilder, and by granting the East Development Lien, Debtor gave East Development a lien on the entirety of the Thomasboro Property, not just on specific Entitled Lots therein.

60.     Moreover, the East Development Lien was not granted to secure an obligation of the Debtor, and Debtor received no direct funding or benefits from East Development in exchange for granting the East Development Lien.

61.     Rather, the East Development Lien was granted to secure a loan of $5 million from East Development to three borrowers/obligors: Defendant Criteria Development, Defendant J. Marion Uter (the Debtor's 50% owner and manager) and E. Stephen Stroud (the Debtor's 50% owner).  For the avoidance of doubt, the Debtor is not a borrower/obligor on this loan.

62.     To evidence this loan, Defendant Criteria Development, Defendant J. Marion Uter and E. Stephen Stroud, each as co-maker, issued a promissory note to Defendant East Development on or about February 23, 2023 (the "**East Development Note**").  For the avoidance of doubt, the Debtor is not a co-maker of the East Development Note.

63.     On information and belief, at all times relevant hereto, Criteria Development was owned, managed and otherwise controlled by Defendant J. Marion Uter, and his son, Paul Uter.

64.     On information and belief, Defendant Uter, Paul Uter, E. Stephen Stroud, and some or all of the private investors behind East Development, including without limitation East Development principal/manager Douglas G. Watson, have previously been and/or are currently involved in numerous other projects and financial co-investments.

14

65.     On information and belief, at all times relevant hereto – including at the time of the ED Transfer – Defendants Uter, Debtor, Criteria Development, and East Development were represented by the same law firm, Manning, Fulton, & Skinner, P.A. ("**Manning Fulton**").

66.     At all times relevant hereto, East Development and Defendants Uter and Criteria Development were and are "affiliates" and "insiders" of the Debtor, as those terms are defined under applicable law.

67.     On or about February 22, 2023, Defendant Uter, acting for the benefit of himself as well as Criteria Development and East Development, with the intent of hindering, delaying and defrauding DIP Lender, caused the Debtor to engage in the ED Transfer in satisfaction of, or as security for, an obligation owed to East Development by Criteria Development and Uter (as guarantor) but not by Debtor.

68.     None of the funds borrowed in exchange for the East Development Note were ever transferred to Debtor or deposited into an account in Debtor's name.  On information and belief, all of these funds were used to fund expenses unrelated to development and construction of the Thomasboro Property.

69.     Furthermore, at the time of the ED Transfer, Debtor was (as it continues to be) insolvent and unable to pay its debts as they become due.

70.     As a result, the ED Transfer was a textbook actual and constructive fraudulent transfer.

### b. *Details Surrounding Thomasboro Landco II LLC*

71.     On or about April 26, 2023, the Debtor conveyed approximately 997.48 acres of the 1138 acres constituting the totality of the Thomasboro Property to Thomasboro II (aka the Thomasboro II Transfer).

15

72.    On or shortly before that same day, Thomasboro II and an entity called Struter Capital LLC were created.

73.    The same attorney from Manning Fulton executing each entity's articles of organization as "Organizer" and causing those articles to be filed with the North Carolina secretary of state that same day.

74.    As DIP Lender would not learn until months after commencing this action, the sole member/owner of Thomasboro II was Eastern NC Holdings LLC.

75.    Eastern NC Holdings LLC was created on or about January 5, 2023.

76.    A different attorney with Manning Fulton executed its articles of organization and caused them to be filed with the North Carolina secretary of state that same day.

77.    On information and belief, on or about April 26, 2023, Eastern NC Holdings LLC was owned by two entities, East Development and Struter Capital LLC.

78.    On information and belief, at all times relevant hereto, the manager and authorized signatory of Eastern NC Holdings LLC was and is East Development's manager, Doug Watson.

79.    On information and belief, the purpose(s) of the Thomasboro II Transfer was/were (i) to effectuate a substitute for repayment of the East Development Note – which by its terms called for repayment in full in cash of the $5 million borrower (plus interest) just for days later on April 30, 2023 – and thus prevent East Development from seeking repayment from Criteria Development, Stroud or Uter or any of their individual or collective assets, and/or (ii) to enhance East Development's security position and likelihood of ultimate repayment on the soon-to-be-delinquent East Development Note and or to obtain additional financing from East Development and related investors by moving almost 90% of the acreage of the Thomasboro

16

Property away from the Debtor and thus out of direct reach of any subsequent efforts by DIP Lender to collect what it is owed by Debtor out of Debtor's assets (*i.e.* DIP Collateral).

80.     Defendant Uter, acting for the benefit of himself as well as Criteria Development and East Development, with the intent of hindering, delaying and defrauding DIP Lender, caused the Debtor to engage in the Thomasboro II Transfer in satisfaction of, or as security for, an obligation owed or to become owing to East Development by Criteria Development and Uter (as guarantor) but not by Debtor.

81.     On information and belief, Thomasboro II paid the Debtor no consideration in exchange for the Thomasboro II Transfer.

82.     Furthermore, on information and belief, at the time of the Thomasboro II Transfer, Debtor was (as it continues to be) insolvent and unable to pay its debts as they become due.

83.     As a result, The Thomasboro II Transfer was a textbook actual and constructive fraudulent transfer.

**G. Uter, on behalf of Debtor And Thomasboro II, Executes First Forbearance Agreement To Avoid DIP Lender's First Motion to Compel**

84.     Debtor's failure to timely make an agreed extension payment due July 15, 2024 prompted DIP Lender to commence an investigation into the status of its DIP Collateral.

85.     As part of this investigation, DIP Lender commissioned a review of the property records maintained by the Register of Deeds in Brunswick County, and thereby learned for the first time about the Third-Party Liens, ED Transfer and Thomasboro II Transfer.

86.     In early August 2024, DIP Lender asked Debtor for assurances that Debtor would be able to repay the DIP Facility upon its maturity at the month, and Debtor indicated it would not be able to do so.

87.     On August 16, 2024, DIP Lender called a default under the DIP Facility, citing the imposition of the Third-Party Liens and the Thomasboro II Transfer.

88.     On August 19, 2024, DIP Lender made a written request to Debtor, in accordance with Section 10.04 of the DIP Credit Agreement, that Debtor provide it with a deed of trust representing the DIP Liens on the Property for DIP Lender to record with the Register of Deeds in Brunswick County.

89.     When Debtor did not comply with this request, Legalist brought a motion asking the Bankruptcy Court to compel the Debtor to issue (or cause to be issued) a deed of trust with respect to the entirety of the Thomasboro Property for the benefit of Legalist.  Debtor opposed the motion, and a hearing before the Bankruptcy Court was scheduled for September 17, 2024. *See* Bankruptcy Case Doc. Nos. 202, 205.

90.     On September 8, 2024, while the First Motion to Compel was pending, Debtor offered to settle the motion under a forbearance agreement "whereby the deed of trust would be delivered and could be recorded, but no action taken on it for 60 days" by which time Debtor promised to pay DIP Lender off in full.

91.     When, in response to this offer, DIP Lender asked for clarification concerning the purpose of Thomasboro II Transfer and whether Debtor had the authority to deliver a deed of trust concerning the portion of the Thomasboro Property then in Thomasboro II's possession, Debtor's counsel responded in a September 11, 2024 email that "[t]he transfer to Thomasboro II was done to deal with tax issues and is owned by the same owners of Thomasboro."

92.     The intent of this representation was to convince DIP Lender that Uter –owner and manager exercising signatory authority of Debtor – was likewise an owner and manager exercising signatory authority of Thomasboro II.

93.     But that representation was not true, Uter knew at the time it was made it was not true, and even though Uter was copied on the September 11, 2024 email, neither he nor Debtor's counsel ever retracted or clarified that representation.

94.     Instead, the representation was repeated by Debtor's counsel to DIP Lender's counsel on a conference call on September 12, 2024, and incorporated into drafts of a forbearance agreement and deed of trust that were circulated as part of the ongoing discussions.

95.     By the time of the September 17, 2024 hearing, the parties had reached an agreement in principal, subject to documentation.  As a result, DIP Lender consented to its Motion to Compel being continued and eventually dropped.

96.     On September 20, 2024, DIP Lender and the Debtor entered into a Forbearance Agreement,[10] wherein DIP Lender agreed to forbear from exercising its rights and remedies against the Debtor in exchange for certain admissions by and deliverables from the Debtor.  *See* Ex. G, § 4.

97.     In exchange, the Debtor obligated itself to provide DIP Lender (among other deliverables) with (a) a deed of trust representing the DIP Lien on the entirety of the Thomasboro Property pursuant to an agreed form to be executed by both Debtor and Thomasboro II, (b) subordination agreements, in form and substance satisfactory to DIP Lender, with each of the five recipients of the Third-Party Liens, (c) a forbearance fee of $500,000, and (d) payoff in full of the DIP Facility on or before October 31, 2024.  *See* Ex. G, § 5.

98.     The Forbearance Agreement contained Debtor's admission that it was in continuing default of the DIP Credit Agreement due to its grant of the Third-Party Liens, its transfer of ownership of almost 90% of the Thomasboro Property to Thomasboro II, and its

---

[10] "**First Forbearance Agreement**" refers to that certain *Forbearance Agreement* entered into as of September 20, 2024 between Debtor and DIP Lender.  The terms of the Forbearance Agreement, a true and correct copy of which is attached hereto as <u>Exhibit H</u>, are hereby expressly incorporated into this Complaint as if fully set forth herein.

payment default, and Debtor's acknowledgement of the amount, validity and enforceability of its then-outstanding DIP Obligations and DIP Liens. *See* Ex. G, §§ 1-3.

99.     Consistent with its earlier representations, the Forbearance Agreement also contained Debtor's express representation that "Debtor and [Thomasboro] II are … owned by the same members" and "all of the [Thomasboro Property] is under the common control of Debtor." *See* Ex. G, § 10(D).

100.     In the signature block of the Forbearance Agreement, Uter signed on behalf of Debtor "and its affiliate under common control Thomasboro Landco II, LLC."

## H. Uter Executes Deed of Trust On Behalf Of Thomasboro II Without Authority To Do So, Then Causes Deed To Be Delivered To DIP Lender And Recorded

101.     On September 26, 2024, Uter, in his capacity as manager of Debtor and his purported capacity as manager of Thomasboro II, executed a deed of trust in favor of DIP Lender, which upon counter-signature by DIP Lender, was filed of record by Debtor's counsel with the Brunswick County Register of Deeds at Book: 5242 Page: 879 on September 27, 2024.[11]

102.     Consistent with earlier representations, the DIP Lender DOT contained representations by Uter (on behalf of Debtor and purportedly on behalf of Thomasboro II) that (a) ownership of the Thomasboro was split "for tax purposes" between Debtor and Thomasboro II, (b) despite this split, "all of the [Thomasboro Property] is under common control of [Debtor]," indicating Debtor and Thomasboro II have the same owner(s) and manager(s), and (c) Thomasboro II has agreed "at the request of, and as an accommodation to Debtor […] to execute and deliver this Deed of Trust to more formally memorialize the lien on land titled in

---

[11] The "**DIP Lender DOT**" a true and correct copy of which is attached hereto as <u>Exhibit I</u>. The terms of the DIP Lender DOT are hereby expressly incorporated into this Complaint as if fully set forth herein.

[Thomasboro II] in favor of [DIP Lender] that was created through the DIP Loan Order when [Debtor] owned all of the Land." *See* Ex. H, at 2.

103.    Defendant J. Marion Uter signed the DIP Lender DOT in separate signature blocks on behalf of both Debtor and Thomasboro II.  Both signatures were notarized.

104.    In the signature block for Thomasboro II, Defendant J. Marion Uter listed his role/title as "Manager".

105.    The DIP Lender DOT was duly recorded on September 27, 2024.

**I.    Debtor Defaults Under First Forbearance Agreement, Prompting DIP Lender to Commence This Adversary Proceeding**

106.    DIP Lender upheld its promise to forbear under the First Forbearance Agreement.

107.    However, other than the DIP Lender DOT and one subordination agreement from New Leaf, Debtor failed to follow through on all deliverables under the First Forbearance Agreement, culminating in its failure to repay DIP Lender in full by October 31, 2024.

108.    On November 1, 2024, DIP Lender filed a complaint commencing this Adversary Proceeding against Debtor, Criteria Development, East Development and Thomasboro II (among others) seeking, among other relief, to avoid the ED Transfer fraudulent transfer as both actually and constructively fraudulent, and to otherwise have the DIP Lien declared the first priority lien on the Thomasboro Property (Adv. Pro. Doc. 1, the "**Original Complaint**").[12]

109.    Notably, the Original Complaint did not also seek to avoid the Thomasboro II Transfer because– in reasonable reliance on the numerous representations by Uter and Debtor's counsel that Debtor and Thomasboro II were under common ownership and control, and at that time having no reason to doubt the validity and enforceability of the DIP Lender DOT that Uter had just executed in his purported capacity as manager for Thomasboro II – DIP Lender believed

---

[12] The Original Complaint also named Caviness & Cates and Great Southern Homes as Defendants, but DIP Lender agreed to dismiss them after they executed subordination agreements in early December 2024.

it had all that it needed to enforce its rights against the Thomasboro Property then-owned by Thomasboro II.

110.    For example, in the weeks preceding and following his execution of the DIP Lender DOT on September 26, 2024, Uter executed several documents recorded with the Brunswick County, North Carolina Register of Deeds on behalf of Thomasboro II as its "Manager":

   a.   A Declaration of Cross Access and Utility Easement and Agreement to Abandon Easement granted by Thomasboro II, which was filed of record with the Brunswick County Register of Deeds at Book: 5209 Page: 625 on July 19, 2024 (a true and correct copy of which is attached hereto as **Exhibit J**);

   b.   A Special Warranty Deed granted by Thomasboro II, which was filed of record with the Brunswick County Register of Deeds at Book: 5219 Page: 881 on August 9, 2024 (a true and correct copy of which is attached hereto as **Exhibit K**);

   c.   A North Carolina Non-Warranty Deed granted by Thomasboro II, which was filed of record with the Brunswick County Register of Deeds at Book: 5248 Page: 415 on October 8, 2024 (a true and correct copy of which is attached hereto as **Exhibit L**).

111.    The signature block and Uter's signature appearing on the foregoing documents are substantially identical to the one appearing on the DIP Lender DOT.

112.    Uter signed each of the foregoing documents in the presence of a notary.

113.    DIP Lender was aware of Exhibits I and J prior to Uter's execution of the DIP Lender DOT, and relied on Uter's execution of Exhibits I and J on behalf of Thomasboro II as corroboration of Uter's representations that he had authority to execute the DIP Lender DOT on behalf of Thomasboro II.

**J.   Thomasboro II Aligns With East Development And Denies that Uter Had Authority to Execute DIP Lender DOT On Its Behalf**

114.    That reliance was shattered on December 10, 2024, when, despite the numerous representations by Uter and Debtor's counsel that Debtor and Thomasboro II were under

22

common ownership and control, former Defendant Thomasboro II appeared in the Adversary Proceeding through different counsel than Debtor and filed a joint answer to the Original Complaint with former Defendant East Development.

115.    In the joint answer, Thomasboro II (a) *denied* that it is under common ownership with the Debtor and (b) *denied* that the DIP Lender DOT was "validly executed, properly authorized, or constitutes a valid and binding obligation of Thomasboro Landco II." *See* Answer, Adv. Pro. Doc. 20, at ¶¶ 25, 27.

**K.    Uter And Debtor Refuse To Refute Thomasboro II Denials Or Respond To DIP Lender Requests, Resulting In Delay And Increased Costs For DIP Lender**

116.    Following this development, DIP Lender repeatedly requested (a) that Debtor provide evidence to refute Thomasboro II's denials and conclusively demonstrate Uter's authority to execute the DIP Lender DOT on behalf of Thomasboro II, (b) that Thomasboro II provide evidence to substantiate its denials, and (c) that both parties agree to execute documentation to the extent required ratifying the DIP Lender DOT to remove any doubt concerning its validity and enforceability.

117.    DIP Lender incorporated these informal requests into formal requests for production of documents served on all defendants on January 10, 2025, including a request for Thomasboro II's operating agreement and other organizational documents.

118.    Such documents which would definitively indicate whether Uter had authority to bind Thomasboro II by execute the DIP Lender DOT on its behalf, and Uter would have access to such documents if indeed they conferred such authority upon him.

119.    By early March, Debtor had still failed to meaningfully respond to DIP Lender's requests.

120. It had become clear that Defendants, East Development and Thomasboro II were acting in concert, maintaining uncertain concerning the validity of the DIP Lender DOT together with East Development's refusal to provide a subordination agreement acknowledging the DIP Lien's indisputable priority over the East Development Lien by virtue of the DIP Financing Order as means for causing delay, increasing litigation costs and creating settlement leverage over DIP Lender.

**L. Uter, Debtor And Criteria Development Fail To Advance Prospects Of Obtaining Funds To Repay DIP Facility**

121. Over this same period, Uter and Debtor failed to make any discernable progress towards viable transactions that would result in repayment of the DIP Facility.

122. In early December 2024, Manning Fulton, on behalf of Uter, Debtor and/or Criteria Development, submitted a half-baked proposal to pursue transactions they represented would result in funds to payoff the DIP Facility in part by January 31, 2025 and in full by March 15, 2025.

123. In reliance on these transactions moving forward, DIP Lender retained real estate advisory firm Hilco to conduct diligence of details of the proposed transactions, to position DIP Lender to be able to facilitate and sign-off on those transactions if they materialized. They did not.

124. Instead, DIP Lender had to chase the Defendants and their professionals for a month before they made themselves available and began sharing information with Hilco in mid-January 2025.

125. Unsurprisingly, no transactions closed on January 31, 2025, but in early February Defendants represented (through their counsel at Manning Fulton) the transactions were

nevertheless moving forward and would close in time to payoff the DIP Facility in full by March 31, 2025.

126.    On February 25, 2025, Defendants (via their counsel at Manning Fulton) sent DIP Lender a new set of transactions, some of which involved the same counter-parties and similar terms, but some which involved new counter-parties and/or terms that had changed significantly from those proposed in December 2024.

127.    In connection therewith, Defendants represented (through their counsel at Manning Fulton) that most, but not all, of these new transactions would be ready to close by April 15, 2025, resulting in a significant (but not full) payoff of the DIP Facility shortly thereafter.

128.    Then in the first week of March 2025, Defendant Criteria Development provided Hilco with updated "cost to complete" numbers, indicating that more than $22 million of further construction is needed to complete the lots that Debtor has committed to sell under existing PSAs with third-party homebuilders.

129.    In a phone call that week with DIP Lender's counsel, Manning Fulton indicated that J. Marion Uter and Paul Uter were meeting with all of these homebuilders the remainder of this week, and that new closing timelines would not be confirmed until after those discussions had concluded.

130.    DIP Lender never received new projected closing timelines.

**M. DIP Lender Files First Amended Complaint**

131.    Defendants' non-responsiveness and foot-dragging prompted DIP Lender to seek leave (which the Bankruptcy Court granted) and to file an amended complaint on March 12, 2025 (Adv. Pro. Doc. 61, the "**First Amended Complaint**").

132. The First Amended Complaint added J. Marion Uter individually as a Defendant party to the Adversary Proceeding and asserted new causes of action, in addition to those carried over from the Original Complaint, seeking (among other relief) (i) to avoid the Thomasboro II Transfer as actually and constructively fraudulent, (ii) to hold Uter and Debtor liable in connection with their fraudulent misrepresentations and recording of a false deed of trust, and (iii) to extend that liability to Criteria Development, East Development and Thomasboro II for engaging in a civil conspiracy with Uter and Debtor to conceal their fraud.

133. On March 27, 2025 Criteria Development submitted an answer to the First Amended Complaint (Adv. Pro. Doc. 75), but Debtor and Uter never answered.

### N. **Mediation Results In Settlement Agreement and Second Forbearance Agreement**

134. On March 27 and 28, 2025, the parties participated in mediation.

135. At the conclusion of mediation, DIP Lender had reached two separate agreements.

136. First, DIP Lender entered into a "**Settlement Agreement**" with East Development and Thomasboro II by which the parties thereafter executed several transactions – including contractually subordinating the East Development Lien to the DIP Lien and the conveyance of all Thomasboro Property back to Debtor – that would enable DIP Lender to be able to foreclose on the Thomasboro Property.

137. In exchange, DIP Lender had to agree not to commence foreclosure before June 1, 2025, to give broad releases to East Development and Thomasboro II and to dismiss them both from this Adversary Proceeding with prejudice. Those releases were significant consideration, given the strength of the liability claims DIP Lender had asserted against East Development and Thomasboro II in the First Amended Complaint.

26

138.     The referenced transactions were effectuated in early April, the Bankruptcy Court approved the Settlement Agreement, and East Development and Thomasboro II were dismissed from this lawsuit.

139.     Second, DIP Lender entered into a "**Second Forbearance Agreement**" with Debtor, Criteria Development and Uter.

140.     The Second Forbearance Agreement was structured similarly to the First Forbearance Agreement, containing admissions of defaults, acknowledgement of indebtedness and promises to repay the DIP Facility by Defendants in exchange for DIP Lender's agreement to forbear (including a stay of proceedings in this lawsuit) until June 1, 2025.

141.     A key difference in the Second Forbearance Agreement was DIP Lender's agreement to accept $41 million as payment in full of the DIP Facility if all such amount was paid on or before the end of May 2025. This was a massive concession by DIP Lender, representing a discount of more than $5 million on the amount that was otherwise due under the DIP Facility at that time.

142.     The Second Forbearance Agreement also provided that if Debtor did not pay DIP Lender $41 million by the end of May 2025, the automatic stay would be lifted to allow DIP Lender to commence foreclosure on the Thomasboro Property.

143.

**O.  Defendants Once Again Fail To Fulfill Their Promise To Repay DIP Facility**

144.     Following the Bankruptcy Court's entry of an order approving the Second Forbearance Agreement on April 14, 2025, DIP Lender received several assurances (but few details) from Manning Fulton in late April and early May that Defendants were working on a plan to obtain $41 million to repay the DIP Facility by the end of May.

145. On a May 20, 2025 conference call, Uter and Defendants' counsel at Manning Fulton confirmed to DIP Lender that plan had fallen apart and Defendants would not be able to repay DIP Lender by the end of the month.

146. As an alternative, Uter and Defendants' counsel at Manning Fulton indicated that Defendants could pursue various transactions that would purportedly result in some near-term payments but take five or six months (i.e. until the end of October or November 2025) to repay the DIP Facility in full.

147. This plan and projected timeline were unacceptable to DIP Lender

148. These developments were deeply disappointing to DIP Lender, particularly in light of the expense and opportunity cost it has incurred to date in reliance on Defendants misrepresentations and failed promises.

149. In light of the history of dealings between the parties, DIP Lender does not anticipate being able to justify further reliance on such promises from Uter and his companies.

150. Accordingly, following expiration of the forbearance period under the Second Forbearance Agreement, DIP Lender determined to pursue foreclosure of the Thomasboro Property and to continue litigating against Defendants in this Adversary Proceeding, in the Bankruptcy Case and in such other fora as may be necessary or appropriate to vindicate its rights and remedies.

151. Consequently, and as explained further below, Legalist relied on the Defendants' fraud to its detriment, has been damaged, and is entitled to seek redress and compensation.

## COUNT I
### FRAUDULENT CONCEALMENT – ED TRANSFER
**(Against Defendants J. Marion Uter, Thomasboro Landco, LLC, and Criteria Development, LLC)**

152. Plaintiff DIP Lender incorporates its prior allegations as if fully set forth herein.

28

153.    The ED Transfer was made by or on behalf of the Debtor with the actual intent to hinder, delay, or defraud its creditors generally, and DIP Lender specifically.

154.    In exchange for the ED Transfer, Debtor received no consideration or consideration of less than reasonably equivalent value than the value of the East Development Lien in the Thomasboro Property.

155.    The ED Transfer was made at a time when Debtor was insolvent and/or Debtor was rendered insolvent following the ED Transfer.

156.    The ED Transfer was intended to and did in fact make it more difficult, time consuming and costly for DIP Lender to enforce its DIP Lien in the Thomasboro Property.

157.    If DIP Lender had been informed of the ED Transfer in advance, as Debtor was required to do under the DIP Loan Agreement and DIP Financing Order, DIP Lender would have halted further advances on the DIP Facility and thereafter not resumed making further advances unless and until it could be assured that (among other things) prior advances under the DIP Facility had been used for construction on the Thomasboro Property as Debtor represented, that construction was on time and on budget, that Debtor's ability to repay the DIP Facility had not deteriorated since the loan was originated, and that East Development had executed proper documentation to ensure the East Development Lien would be subordinate in all respects to DIP Lender's DIP Liens.

158.    Uter (and by imputation, Debtor and Criteria Development) knew this would be DIP Lender's reaction and decided to proceed with the ED Transfer in secret rather than notify DIP Lender, provide it with DIP Lender's requested assurances, and risk DIP Lender deciding not to consent to the ED Transfer and/or to stop advancing funds under the DIP Facility.

159.    In order to conceal the ED Transfer from DIP Lender as long as possible, Uter never disclosed the ED Transfer to DIP Lender, nor did he cause any entity he owned or controlled, including Debtor or Criteria, or any agent, including Manning Fulton, to do so.

160.    The ED Transfer and Defendants' concealment of same occurred less than two years prior to commencement of this Adversary Proceeding.

161.    Because of Defendants' concealment efforts, DIP Lender did not discover the ED Transfer until less than two years prior to commencement of this Adversary Proceeding.

162.    As a result of Defendants' concealment of the ED Transfer, DIP Lender continued to perform under the DIP Credit Agreement.

163.    DIP Lender has suffered damages as a direct and proximate result of Uter, Debtor and Criteria Developments' concealment, including by advancing a total of approximately $4.8 million under the DIP Facility as well as incurring costs and fees after the ED Transfer had been secretly effectuated.

WHEREFORE, Plaintiff DIP Lender respectfully requests judgment in its favor and against Defendants J. Marion Uter, Thomasboro Landco, LLC, and Criteria Development, LLC:

A.    Finding, concluding, adjudicating and/or declaring that Defendants Uter, Debtor, and Criteria Development fraudulently concealed the ED Transfer from DIP Lender, causing it to continue performing under the DIP Credit Agreement,

B.    Awarding DIP Lender damages in an amount which will fully compensate it for the damages, including punitive damages as allowed for by law, it suffered as a result of Defendants Uter's, Debtor's, and Criteria Development's concealment, and

C.    Granting such other and further relief as the Court deems just and proper.

30

## COUNT II
### FRAUDULENT MISREPRESENTATIONS – ED TRANSFER
**(Against Defendants J. Marion Uter and Thomasboro Landco, LLC)**

164. Plaintiff DIP Lender incorporates its prior allegations as if fully set forth herein.

165. After Uter effectuated the ED Transfer on or about February 22, 2023, Uter (on behalf of Debtor) made four additional borrowing requests under the DIP Facility on or about March 1, 2023, April 1, 2023, May 1, 2023 and June 5, 2023.

166. In each request, Uter (on behalf of Debtor) expressly represented, using the form attached as Exhibit A to the DIP Credit Agreement and approved by the Bankruptcy Court in the Final DIP Order, that all representations and warranties in the DIP Credit Agreement remained true and correct as of the date of such request, including that the Thomasboro Property was free and clear of liens besides the DIP Liens, that there had been no material adverse changes, and that Debtor had not made any material misstatements or omissions.

167. Each of these representations was false: The ED Transfer had attached the East Development Lien to the Thomasboro Property; the result of ED Transfer on the Debtor's financial position and ability repay the DIP Facility in accordance with its terms was materially and adversely changed as a result of the ED Transfer; and Debtor made a material omission by failing to notify DIP Lender of the ED Transfer.

168. Each of these representations was made less than two years prior to commencement of this action.

169. Moreover, because Uter, Debtor and Criteria Development intentionally concealed the ED Transfer from DIP Lender, DIP Lender did not discover the falsity of these representations until less than two years prior to commencement of this action.

170. Uter (and by imputation, Debtor) knew each of these representations was false.

31

171.     Despite knowing they were false, Uter (and by imputation, Debtor) made each of these representations for the purpose and with the intend of inducing DIP Lender's reliance thereon so that DIP Lender would advance funds under the DIP Facility.

172.     In reasonable reliance on these representations, DIP Lender advanced Debtor a total of approximately $4.8 million under the DIP Facility in response to those four borrowing requests, which it would not have done if it had been aware the ED Transfers had occurred.

173.     None of the funds advanced by DIP Lender in reliance on these representations has been repaid.

174.     DIP Lender has suffered damages as a direct and proximate result of Uter and Debtor's misrepresentations.

WHEREFORE, Plaintiff DIP Lender respectfully requests judgment in its favor and against Defendants J. Marion Uter and Thomasboro Landco, LLC:

A.  Finding, concluding, adjudicating and/or declaring that Defendants Uter and Debtor used fraudulent misrepresentations to borrow funds under the DIP Facility after the ED Transfer occurred,

B.  Awarding DIP Lender damages in an amount which will fully compensate it for the damages, including punitive damages as allowed for by law, it suffered as a result of Defendants Uter and Debtor's, misrepresentations, and

C.  Granting such other and further relief as the Court deems just and proper.

## COUNT III
### FRAUDULENT CONCEALMENT – THOMASBORO II TRANSFER
**(Against Defendants J. Marion Uter, Thomasboro Landco, LLC, and Criteria Development, LLC)**

175.     Plaintiff DIP Lender incorporates its prior allegations as if fully set forth herein.

176.    The Thomasboro II Transfer was made by or on behalf of the Debtor with the actual intent to hinder, delay, or defraud its creditors generally, and DIP Lender specifically.

177.    In exchange for the Thomasboro II Transfer, Debtor received no consideration or consideration of less than reasonably equivalent value than the value of the East Development Lien in the Thomasboro Property.

178.    The Thomasboro II Transfer was made at a time when Debtor was insolvent and/or Debtor was rendered insolvent following the Thomasboro II Transfer.

179.    The Thomasboro II Transfer was intended to and did in fact make it more difficult, time consuming and costly for DIP Lender to enforce its DIP Lien in the Thomasboro Property.

180.    If DIP Lender had been informed of the Thomasboro II Transfer in advance, as Debtor was required to do under the DIP Loan Agreement and DIP Financing Order, DIP Lender would have halted further advances on the DIP Facility and thereafter not resumed making further advances unless and until it could be assured that (among other things) prior advances under the DIP Facility had been used for construction on the Thomasboro Property as Debtor represented, that construction was on time and on budget, that Debtor's ability to repay the DIP Facility had not deteriorated since the loan was originated, and that Thomasboro II had executed proper documentation to ensure DIP Lender's DIP Lien would continue to attach to the portion of the Thomasboro Property to be transferred to Thomasboro and that such DIP Liens would continue to have priority over all other liens therein.  .

181.    Uter (and by imputation, Debtor and Criteria Development) knew this would be DIP Lender's reaction and decided to proceed with the Thomasboro II Transfer in secret rather than notify DIP Lender, provide it with DIP Lender's requested assurances, and risk DIP Lender

33

deciding not to consent to the Thomasboro II Transfer and/or to stop advancing funds under the DIP Facility.

182. In order to conceal the Thomasboro II Transfer from DIP Lender as long as possible, Uter never disclosed the Thomasboro II Transfer to DIP Lender, nor did he cause any entity he owned or controlled, including Debtor or Criteria, or any agent, including Manning Fulton, to do so.

183. Additionally, at the direction of Uter or in any event to help conceal the Thomasboro II Transfer from DIP Lender, Manning Fulton – who prepared the warranty deed that Uter (on behalf of Debtor) executed on April 26, 2023 to transfer almost 1000 acres of the Thomasboro Property to Thomasboro II – did not record that deed with the Registrar of Brunswick County until November 27, 2023.

184. The Thomasboro II Transfer and Defendants' concealment of same occurred less than two years prior to commencement of this Adversary Proceeding.

185. Because of Defendants' concealment efforts, DIP Lender did not discover the Thomasboro II Transfer until less than two years prior to commencement of this Adversary Proceeding.

186. As a result of Defendants' concealment of the Thomasboro II Transfer, DIP Lender continued to perform under the DIP Credit Agreement.

187. DIP Lender has suffered damages as a direct and proximate result of Uter, Debtor and Criteria Developments' concealment, including by advancing a total of approximately $2.7 million under the DIP Facility as well as incurring costs and fees after the Thomasboro II Transfer had been secretly effectuated.

WHEREFORE, Plaintiff DIP Lender respectfully requests judgment in its favor and against Defendants J. Marion Uter, Thomasboro Landco, LLC, and Criteria Development, LLC:

A. Finding, concluding, adjudicating and/or declaring that Defendants Uter, Debtor, and Criteria Development fraudulently concealed the Thomasboro II Transfer from DIP Lender, causing it to continue performing under the DIP Credit Agreement,

B. Awarding DIP Lender damages in an amount which will fully compensate it for the damages, including punitive damages as allowed for by law, it suffered as a result of Defendants Uter's, Debtor's, and Criteria Development's concealment, and

C. Granting such other and further relief as the Court deems just and proper.

**COUNT IV**
**FRAUDULENT MISREPRESENTATIONS – THOMASBORO II TRANSFER**
**(Against Defendants J. Marion Uter and Thomasboro Landco, LLC)**

188.    Plaintiff DIP Lender incorporates its prior allegations as if fully set forth herein.

189.    After Uter effectuated the ED Transfer on or about April 26, 2023, Uter (on behalf of Debtor) made two additional borrower requests on or about May 1, 2023 and June 5, 2023.

190.    In each request, Uter (on behalf of Debtor) expressly represented, using the form attached as Exhibit A to the DIP Credit Agreement and approved by the Bankruptcy Court in the Final DIP Order, that all representations and warranties in the DIP Credit Agreement remained true and correct as of the date of such request, including that the Thomasboro Property was free and clear of liens besides the DIP Liens, that there had been no material adverse changes, and that Debtor had not made any material misstatements or omissions.

191.    Each of these representations was false:  The Thomasboro II Transfer had attached the East Development Lien to the Thomasboro Property; the result of Thomasboro II

35

Transfer on the Debtor's financial position and ability repay the DIP Facility in accordance with its terms was materially and adversely changed as a result of the Thomasboro II Transfer; and Debtor made a material omission by failing to notify DIP Lender of the Thomasboro II Transfer.

192.    Each of these representations was made less than two years prior to commencement of this action.

193.    Moreover, because Uter, Debtor and Criteria Development intentionally concealed the Thomasboro II Transfer from DIP Lender, DIP Lender did not discover the falsity of these representations until less than two years prior to commencement of this action.

194.    Uter (and by imputation, Debtor) knew each of these representations was false.

195.    Despite knowing they were false, Uter (and by imputation, Debtor) made each of these representations for the purpose and with the intend of inducing DIP Lender's reliance thereon so that DIP Lender would advance funds under the DIP Facility.

196.    In reasonable reliance on these representations, DIP Lender advanced Debtor a total of approximately $2.7 million under the DIP Facility in response to those four borrowing requests, which it would not have done if it had been aware the Thomasboro II Transfers had occurred.

197.    None of the funds advanced by DIP Lender in reliance on these representations has been repaid.

198.    DIP Lender has suffered damages as a direct and proximate result of Uter and Debtor's misrepresentations.

WHEREFORE, Plaintiff DIP Lender respectfully requests judgment in its favor and against Defendants J. Marion Uter and Thomasboro Landco, LLC:

36

A. Finding, concluding, adjudicating and/or declaring that Defendants Uter and Debtor used fraudulent misrepresentations to borrow funds under the DIP Facility after the Thomasboro II Transfer occurred,

B. Awarding DIP Lender damages in an amount which will fully compensate it for the damages, including punitive damages as allowed for by law, it suffered as a result of Defendants Uter and Debtor's, misrepresentations, and

C. Granting such other and further relief as the Court deems just and proper.

## COUNT V
### BREACH OF CONTRACT – FIRST FORBEARANCE AGREEMENT
### (Against Defendant Thomasboro Landco, LLC)

199.    Plaintiff DIP Lender incorporates its prior allegations as if fully set forth herein.

200.    Debtor and DIP Lender entered in to the First Forbearance Agreement, which constitutes a valid and binding contract.

201.    Debtor breached the First Forbearance Agreement by representing and warranting, among other things, that Debtor and Thomasboro II were affiliated entities owned by the same members and that the Thomasboro Property remained under the common control of the Debtor.

202.    Furthermore, Debtor breached the First Forbearance Agreement by, among other things, failing to deliver a fully executed deed of trust to DIP Lender covering the entirety of the Thomasboro Property.

203.    DIP Lender has suffered damages as a direct and proximate result of the Debtor's breach of the First Forbearance Agreement.

WHEREFORE, Plaintiff DIP Lender respectfully requests judgment in its favor and against Defendant Thomasboro Landco, LLC:

A. Finding, concluding, adjudicating and/or declaring that the Debtor breached the First Forbearance Agreement,

B. Awarding DIP Lender damages in an amount which will fully compensate it for the Debtor's breach of the First Forbearance Agreement, and

C. Granting such other and further relief as the Court deems just and proper.

**COUNT VI**
**FRAUDULENT INDUCEMENT – FIRST FORBEARANCE AGREEMENT**
**(Against Defendants J. Marion Uter and Thomasboro Landco, LLC)**

204.    Plaintiff DIP Lender incorporates its prior allegations as if fully set forth herein.

205.    Uter and Debtor made representations to DIP Lender through their attorneys, and in the First Forbearance Agreement, that the Debtor and Thomasboro II were affiliated entities owned by the same members, that the Thomasboro Property remained under the common control of the Debtor, and that Uter possessed the authority to act at all relevant times hereto on behalf of Thomasboro II.

206.    These representations were false, and Uter and Debtor knew said representations were false when they were made.

207.    Uter and Debtor intended for DIP Lender to act on these representations, and DIP Lender did reasonably rely upon these representations when it entered into the First Forbearance Agreement and agreed to forbear from exercising its rights and remedies against the Debtor, including by consenting to dismissal of its First Motion to Compel before the Bankruptcy Court.

208.    DIP Lender would not have entered into the First Forbearance Agreement except for Uter and Debtor's representations.

209.    DIP Lender has suffered damages as a direct and proximate result of Uter, Debtor, and Thomasboro II's misrepresentations.

38

WHEREFORE, Plaintiff DIP Lender respectfully requests judgment in its favor and against Defendants J. Marion Uter and Thomasboro Landco, LLC:

A. Finding, concluding, adjudicating and/or declaring that Defendants Uter and Debtor fraudulently induced DIP Lender into entering into the First Forbearance Agreement,

B. Awarding DIP Lender damages in an amount which will fully compensate it for the damages, including punitive damages as allowed for by law, it suffered as a result of Defendants Uter and Debtor's misrepresentations, and

C. Granting such other and further relief as the Court deems just and proper.

## COUNT VII
### NEGLIGENT MISREPRESENTATION – FIRST FORBEARANCE AGREEMENT
**(Against Defendants J. Marion Uter and Thomasboro Landco, LLC)**

210.    Plaintiff DIP Lender incorporates its prior allegations as if fully set forth herein.

211.    Uter and Debtor made representations to DIP Lender through their attorneys, and in the First Forbearance Agreement, that the Debtor and Thomasboro II were affiliated entities owned by the same members, that the Thomasboro Property remained under the common control of the Debtor, and that Uter possessed the authority to act at all relevant times hereto on behalf of Thomasboro II.

212.    DIP Lender justifiably relied upon these representations, to its detriment, when it entered into the First Forbearance Agreement and agreed to forbear from exercising its rights and remedies against the Debtor, including by consenting to dismissal of its First Motion to Compel before the Bankruptcy Court.

213.    Uter and Debtor owed DIP Lender a duty of care in making these representations, and they were made based upon information prepared without reasonable care.

214.	DIP Lender has suffered damages as a direct and proximate result of Uter and Debtor's misrepresentations.

WHEREFORE, Plaintiff DIP Lender respectfully requests judgment in its favor and against Defendants J. Marion Uter and Thomasboro Landco, LLC:

A.	Finding, concluding, adjudicating and/or declaring that Defendants Uter and Debtor's negligent misrepresentations induced DIP Lender into entering into the Forbearance Agreement,

B.	Awarding DIP Lender damages in an amount which will fully compensate it for the damages it suffered as a result of Defendants Uter and Debtor's misrepresentations, and

C.	Granting such other and further relief as the Court deems just and proper.

## COUNT VIII
## VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (N.C. GEN. STAT. ANN. § 75-16)
### (Against Defendants J. Marion Uter and Thomasboro Landco, LLC)

215.	Plaintiff DIP Lender incorporates its prior allegations as if fully set forth herein.

216.	Pursuant to N.C. Gen. Stat. Ann. § 14-118.6(d), the presentation or filing of an instrument with a register of deeds that purports to be a lien or encumbrance that is determined to be materially false, fictitious, or fraudulent shall constitute a violation of the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. Ann. § 75-1.1).

217.	By signing and filing the DIP Lender DOT with the Brunswick County, NC Register of Deeds purportedly on behalf of Thomasboro II, Uter and Debtor caused the filing of a false lien or encumbrance against the Thomasboro Property.

218.	Uter and Debtor knew, or had reason to know, that that the DIP Lender DOT contained a materially false, fictitious, or fraudulent statement or representation.

40

219. Accordingly, Uter and Debtor's presentation and filing of the DIP Lender DOT with the Brunswick County, NC Register of Deeds constitutes a violation of the North Carolina Unfair and Deceptive Trade Practices Act.

220. DIP Lender was injured by reason of Uter and Debtor's filing of the DIP Lender DOT.

WHEREFORE, Plaintiff DIP Lender respectfully requests judgment in its favor and against Defendants J. Marion Uter and Thomasboro Landco, LLC:

A. Finding, concluding, adjudicating and/or declaring that Defendants J. Marion Uter and Thomasboro Landco, LLC's filing of the DIP Lender DOT with the Brunswick County, NC Register of Deeds constitutes the filing of a false lien or encumbrance as set forth in N.C. Gen. Stat. Ann. § 14-118.6,

B. Finding, concluding, adjudicating and/or declaring that such false filing constitutes a violation of the North Carolina Unfair and Deceptive Trade Practices Act,

C. Awarding DIP Lender damages in an amount which will fully compensate it for the damages it suffered as a result of Defendants J. Marion Uter and Thomasboro Landco, LLC's violation of the North Carolina Unfair and Deceptive Trade Practices Act,

D. Awarding DIP Lender treble damages as prescribed by N.C. Gen. Stat. Ann. § 75-16, and

E. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted this the 1st day of July, 2025.

/s/ *Jeremy C. Hollembeak*
Jeremy C. Hollembeak
(admitted *pro hac vice*)

41

BAIRD HOLM LLP
1700 Farnam Street, Suite 1500
Omaha, NE 68102-2068
(402) 636-8317
jhollembeak@bairdholm.com

-and-

Mark P. Williams
NORMAN, WOOD, KENDRICK & TURNER
Ridge Park Place, Suite 3000
1130 22nd Street South
Birmingham, AL 35205
(205) 328-6643

*Attorneys for Plaintiff DIP Lender Legalist, Inc.*